UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EILEEN VARGAS
    Plaintiff,

    v.                               CIVIL ACTION NO.
                                         10-10508-NMG

MICHAEL J. ASTRUE, Commissioner
Social Security Administration,
    Defendant.


**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION FOR AN ORDER REVERSING OR REMANDING THE**
**DECISION OF THE COMMISSIONER (DOCKET ENTRY # 11); DEFENDANT'S**
**MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**
<u>**(DOCKET ENTRY # 13)**</u>

**June 27, 2011**

**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties,
plaintiff Eileen Vargas ("plaintiff") and defendant Michael J.
Astrue, Commissioner of the Social Security Administration ("the
Commissioner"). Plaintiff seeks to reverse the decision of the
Commissioner under 42 U.S.C. § 405(g). (Docket Entry # 11). The
Commissioner moves for an order affirming the denial of benefits
under 42 U.S.C. § 405(g). (Docket Entry # 13).


<u>PROCEDURAL HISTORY</u>

On August 18, 2003, plaintiff filed an application for
supplemental security income ("SSI") with the Social Security

Administration ("SSA").  (Tr. 80-82).  Plaintiff reapplied and received benefits beginning on February 1, 2006.  The Commissioner denied plaintiff's claim and plaintiff requested a hearing before an administrative law judge ("first ALJ").  (Tr. 78).  A hearing was held on August 3, 2005.  (Tr. 455-483).  The first ALJ denied plaintiff's claim on September 16, 2005.  (Tr. 39-53).  Plaintiff appealed the decision and the Appeals Council remanded the decision for a second hearing on July 2, 2008.  (Tr. 484-515).  On July 8, 2008, a second administrative law judge ("ALJ") did not find plaintiff to be disabled during the relevant period of August 18, 2003 to January 31, 2006.  (Tr. 14-32).  Plaintiff appealed the decision and the Appeals Council denied review thereby making the ALJ's decision the final decision.  (Tr. 7-10).

Plaintiff filed this action on March 25, 2010.  (Docket Entry # 1).  She challenges the ALJ's evaluation of her fibromyalgia.  (Docket Entry # 12).

## FACTUAL BACKGROUND

I.  Plaintiff's Medical History

Anis Rahman, M.D. ("Dr. Rahman"), a state agency physician, examined plaintiff on November 5, 2003, and noted her involvement

in a car accident two years before. He determined she was "in no acute distress" and she could move "all her extremities normally." (Tr. 154-156). On November 7, 2003, another state agency physician conducted a physical residual functional capacity assessment. (Tr. 157-164). The physician concluded that plaintiff could do light work[1] including lifting ten pounds frequently, 20 pounds occasionally, stand or walk about six hours in an eight hour work day and sit for six hours in an eight hour work day. (Tr. 158).

On January 20, 2004, plaintiff went to the Greater New Bedford Community Health Center ("GNBCHC") with complaints of body pains. (Tr. 213). She returned on February 2, 2004, with a cold and body pains and again on February 20, 2004, with headaches. (Tr. 214-215).

---

[1] Light work is defined in 20 C.F.R. § 404.1567 as follows:

Light Work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Marcia Ripski, M.D. ("Dr. Ripski"), another state agency physician, completed a physical residual functional capacity assessment on April 28, 2004. (Tr. 220-229). In the assessment, Dr. Ripski concluded that plaintiff could do light work including lifting ten pounds frequently, 20 pounds occasionally, stand or walk for six hours in an eight hour work day and sit for six hours in an eight hour work day. (Tr. 221).

On May 5, 2004, plaintiff saw Guillermo Gonzalez, M.D. ("Dr. Gonzalez"), a psychiatrist. (Tr. 331-333). Dr. Gonzalez concluded that plaintiff could do self care activities including cooking, cleaning, shopping, handling money and driving. (Tr. 333). Ann L. Leal, R.N. ("Nurse Leal") also saw plaintiff on May 5, 2004, at GNBCHC, at which time Nurse Leal assessed diffuse joint pain, upper and lower extremity paresthesias,[2] obesity, and hyperinsulinemia.[3] (Tr. 240). Nurse Leal referred plaintiff to neurologist Arun Rajan, M.D. ("Dr. Rajan") who examined her for numbness and tingling in her feet and hands, headaches and sleep disturbance. (Tr. 229-232). Dr. Rajan indicated that the

---

[2] Paresthesia is an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. William A.N. Dorland, Dorland's Illustrated Medical Dictionary, p. 1370 (2003).

[3] Hyperinsulinemia is defined as excessively high blood insulin levels. William A.N. Dorland, Dorland's Illustrated Medical Dictionary, p. 882 (2003).

examination was consistent with early signs of peripheral neuropathy and that plaintiff's symptoms were secondary to peripheral neuropathy related to diabetes. (Tr. 231).

On July 21, 2004, plaintiff returned to GNBCHC for lower back and joint pain that had lasted for three days. (Tr. 249). Nurse Leal saw plaintiff again on August 4, 2004, for upper and lower extremity joint pain and, although Nurse Leal doubted the pain was systemic, she referred plaintiff to rheumatology. (Tr. 252). Gail Davidson, M.D. ("Dr. Davidson"), a rheumatologist, examined plaintiff on September 20, 2004. (Tr. 299-303). Plaintiff rated her pain and discomfort as six on a ten point scale. (Tr. 299). Dr. Davidson concluded that plaintiff's symptoms were likely fibromyalgia and gave her an informational booklet on the condition. (Tr. 303). On November 1, 2004, Dr. Davidson saw plaintiff again for back pain and sore joints in plaintiff's hands. (Tr. 305).

On December 15, 2004, Nurse Leal saw plaintiff for dizziness and upper back and neck pains and Nurse Leal's impression was that the upper back pain was due to deconditioning. (Tr. 270). Plaintiff returned to Dr. Davidson on January 1, 2005, complaining of pain all over and again rated the severity as six on a ten point scale. (Tr. 306). Although Dr. Davidson noted

negative lab results, she assessed fibromyalgia. (Tr. 306).

Plaintiff followed up with Dr. Davidson three months later on

March 7, 2004, complaining of pain all over but particularly in

the lower back and right shoulder. (Tr. 308).

Nurse Leal referred plaintiff to Roland Chan, M.D. ("Dr.

Chan") who plaintiff saw on May 3, 2005. (Tr. 296-297). Dr.

Chan noted multiple tender points, concluding diffuse pain

syndrome and opined a belief that plaintiff experienced would be

fibromyalgia. (Tr. 297). Plaintiff requested a note from Nurse

Leal on May 10, 2005, excusing her from performing 20 hours per

week of community service work at the YMCA that plaintiff was

obligated to complete for welfare benefits. (Tr. 284). Nurse

Leal provided a note on May 11, 2005, recommending that plaintiff

not do any heavy work that may exacerbate the pain but that

plaintiff remain active and not sedentary. (Tr. 295).

On May 16, 2005, Dr. Davidson completed a physical capacity

evaluation of plaintiff. (Tr. 420). Dr. Davidson found that

plaintiff could lift five pounds frequently and up to 25 pounds

occasionally. (Tr. 420). The doctor also concluded that

plaintiff could only sit for three hours a day and stand or walk

for one hour a day. (Tr. 420).

Plaintiff saw Dr. Chan again on August 4, 2005. (Tr. 382). The doctor reported that x-rays of plaintiff's knees and spine were normal and that plaintiff's blood work was normal. (Tr. 382). Dr. Chan assessed that the pain was primarily musculoskeletal and lab values did not demonstrate evidence of an inflammatory process. (Tr. 382). Dr. Chan concluded that the symptoms were due to deconditioning and morbid obesity and referred plaintiff to Parakrama Ananta, M.D. ("Dr. Ananta"), a physiatrist. (Tr. 382).

Dr. Ananta saw plaintiff on September 29, 2005. (Tr. 384-385). The doctor found that plaintiff's symptoms were consistent with myofascial pain syndrome and recommended that plaintiff start aggressive physical therapy for range of motion exercises, functional restoration, aerobic conditioning, endurance training and home exercise. (Tr. 385). Dr. Chan saw plaintiff again on December 12, 2005, and concluded that plaintiff had diffuse pain syndrome that was likely "psychosomatic."[4] (Tr. 383).

II. SSA Hearings

---

[4] Psychosomatic symptoms refer to those which pertain to the mind body relationship; having bodily symptoms of psychic, emotional or mental origin. William A.N. Dorland, Dorland's Illustrated Medical Dictionary, p. 1540 (2003).

Plaintiff applied for SSI on August 18, 2003, and claimed to have been disabled due to pain since February 14, 2000. (Tr. 80). After the application was denied, plaintiff requested a hearing by an administrative law judge. (Tr. 78). The first hearing before the first ALJ was held on August 3, 2005, and included the testimony of a medical expert, plaintiff and a vocational expert. (Tr. 455-483).

The medical expert, Henry Freedman, M.D. ("Dr. Freedman"), testified at the hearing that patients are referred to rheumatologists when there is some sort of joint disease, which is usually objectively detectable by visible bumps on the joints in x-rays. (Tr. 460). Dr. Freedman also testified that based on Dr. Chan's examination notes, it appears Dr. Chan was aware of the latest literature and commentary on fibromyalgia when he examined plaintiff. (Tr. 464).

Plaintiff testified that she lived in a second floor apartment with her seven children, ages three and a half to 16 at the time. (Tr. 470). The only income plaintiff received at the time was $1,067 per month from welfare and $560 per month from food stamps. (Tr. 471). Plaintiff's brother lived with their mother in an apartment on the third floor of the same building and plaintiff relied on him for rides to get around. (Tr. 471).

Since November of 2004, plaintiff had been obligated to perform community service to receive her welfare benefits, which she did at the YMCA. (Tr. 471). The tasks that plaintiff did while volunteering included making sure children did not go where they were not supposed to, talking to people and small tasks around the office such as making photocopies. (Tr. 472). Plaintiff testified that a doctor from St. Jude's Hospital gave her one week to rest and during that time she lost her welfare benefits for not completing her community service hours. (Tr. 473).

Upon questioning by her attorney, plaintiff testified that she missed her volunteer work at the YMCA once or twice in a typical week when she could not get up due to muscle pain and numbness in her legs. (Tr. 474). After working four hours a day, plaintiff would go home and lay down because of tiredness. (Tr. 474). Plaintiff also suffered from sleeping problems and took medication to help her fall asleep. (Tr. 475). She testified that her brother and mother helped her with housework, taking care of the children and grocery shopping. (Tr. 477). Plaintiff testified further that she had headaches two to three times a week with strong pains on both sides of her head, nausea and an increased sensitivity to lights, noise and people. (Tr. 477).

9

Finally, at the first hearing, vocational expert Kenneth Smith ("Smith"), testified about available jobs in the national economy for a person with similar skills and conditions as plaintiff. (Tr. 481-482). Smith testified that there were 1,100 to 1,300 unskilled jobs that one could perform at the sedentary level in southeastern Massachusetts and Rhode Island. (Tr. 481). He further testified that the number of available jobs diminished considerably if a person could not use his or her fingers, suffered from extreme pains or had a severe inability to attend and concentrate. (Tr. 482).

The first ALJ denied the claim. (Tr. 39-53). Plaintiff appealed the decision to the Appeals Council which remanded the decision (Tr. 54-57) and a second hearing took place on July 2, 2008. (Tr. 484-515). At the second hearing, plaintiff testified as well as medical expert John Ruggiano, M.D. ("Dr. Ruggiano") and vocational expert Estelle Hutchinson ("Hutchinson"). (Tr. 485).

At the second hearing, plaintiff testified that she was disabled due to joint pain, muscle spasms, fibromyalgia, asthma, diabetes, sleep function and depression and that she could only sit for five to ten minutes at a time due to lower back problems. (Tr. 489-490). She further testified that during the relevant

period she could only stand for ten to 15 minutes without complications in her back and she could only walk for ten to 15 minutes without stopping to rest, but she did not use a cane, crutch or back brace. (Tr. 489). Plaintiff also testified that she required assistance dressing and bathing, had trouble lifting a gallon of milk and had difficulty with tasks that involved using her legs because of pain. (Tr. 491). During the relevant time period, the only job plaintiff attempted was with a cable company but the job only lasted three days. (Tr. 493).

Plaintiff claimed that her mother and children did household tasks for her including laundry, sweeping, vacuuming, mopping, cleaning, and shopping for groceries, although plaintiff helped in a limited capacity. (Tr. 495). On Sundays, plaintiff tried to go to church but sometimes could not because of trouble sleeping the preceding nights, migraines and pains in her back and neck. (Tr. 497). As for hobbies, plaintiff tried to read and cook but claimed that sometimes she could not read because of migraines and not being able to focus her eyes. She further acknowledged she did not have difficulty cooking. (Tr. 500).

Dr. Ruggiano, who is a board certified member of the American Board of Psychiatry and Neurology, testified as a medical expert. (Tr. 502). Dr. Ruggiano testified that there

11

was no significant finding in the medical record of mental impairment prior to May 5, 2004. (Tr. 503). The medical record contains notes from a consultation with Dr. Gonzalez on May 5, 2004, that indicated major depression. (Tr. 331-341). In the notes from plaintiff's visits with the psychiatrist, a GAF of 55 is recorded, which according to Dr. Ruggiano is consistent with the psychological ability to perform full time, competitive employment. (Tr. 503). Dr. Gonzalez also saw plaintiff on May 17, June 2, and December 6, 2004, and then not until January 31, 2006. (Tr. 503). Dr. Gonzalez's examination notes indicate that plaintiff was stable during this period and had no issues regarding intellectual functioning. (Tr. 504). The psychiatric medical record also does not indicate that Dr. Gonzalez believed plaintiff could not perform full time, repetitive employment on a sustained basis. (Tr. 504). Therefore, the medical expert opined at the hearing that it would be reasonable to conclude plaintiff had the mental capacity to perform simple, routine, repetitive tasks on a sustained basis over an eight hour work day in a stable work environment. (Tr. 504).

Hutchinson, the vocational expert, also testified at the hearing. (Tr. 510). In her testimony, she stated that someone with all the symptoms, impairments and limitations alleged by

12

plaintiff would not be able to perform any sustained competitive employment. (Tr. 511). When the ALJ posed a hypothetical that included details from plaintiff's physical residual functioning capacity test in March of 2006 (Tr. 363-375), Hutchinson testified that plaintiff would be able to do jobs at the sedentary and light levels. (Tr. 512). Jobs of this nature would include assembler, assembly press operator, foot press operator, packager, inspector and polisher as well as others, which, according to Hutchinson, constituted over 15,000 jobs in the southeastern Massachusetts and Rhode Island region. (Tr. 513). A person performing these jobs would be required to perform at a certain level of production and an inability to meet that level over a period of time would likely result in loss of the job according to the expert. (Tr. 514). Therefore, if plaintiff's need for rest due to pain or migraines could not be accommodated by lunch and other breaks, it may preclude her ability to sustain those jobs, according to Hutchinson. (Tr. 515).

On July 8, 2008, the ALJ found that plaintiff was not disabled during the relevant period. (Tr. 14-32). Plaintiff appealed the decision and on January 21, 2010, the Appeals

Council denied review making the ALJ's decision the final decision of the administrative proceedings. (Tr. 7-10).

DISCUSSION

## I. Jurisdiction and Standard of Review

The ALJ's decision is final once the Appeals Council denies review. 20 C.F.R. §§ 404.981 & 416.1481. The court, however, has the power to affirm, modify or reverse the ALJ's decision with or without remanding the case for a hearing. 42 U.S.C. § 405(g). The findings of the ALJ are conclusive if supported by substantial evidence. See Richardson v. Perales, 402 U.S. 389, 390 (1971); Seavey v. Barnhart, 267 F.3d 1, 9 (1st Cir. 2001); Manso-Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996). If the ALJ ignored evidence, misapplied the law or judged matters entrusted to experts, however, his findings are not conclusive. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The ultimate determination of disability and conflicts in the evidence are for the ALJ, not the courts. Sanchez v. Barnhart, 230 F.Supp.2d 250 (D.P.R. 2002); Seavey v. Barnhart, 267 F.3d at 9; Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 222 (1st Cir. 1981).

14

Even if the record arguably justifies a different conclusion, this court must affirm the ALJ's decision, as long as it is supported by substantial evidence.  Rodriquez v. Secretary of Health and Human Services, 819 F.2d 1, 2 (1st Cir. 1987). Substantial evidence is more than a scintilla of evidence that a reasonable person could find sufficient to support the result. Musto v. Halter, 135 F.Supp.2d 220, 225 (D.Mass. 2001).  If considering the evidence as a whole, a reasonable mind could accept the ALJ's conclusion as adequate, substantial evidence exists.  Musto, 135 F.Supp.2d at 225 (citing Rodriquez, 647 F.2d at 222).

II.  Disability Determination

The Social Security Act defines a disability as the:

[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Impairments must be of such severity that the claimant is not only unable to do her previous work but, "'considering her age, education, and work experience, engage in any other kind of substantial work which exists in the national economy.'"  Deblois v. Secretary of Health and Human Services,

686 F.2d 76, 79 (1ˢᵗ Cir. 1982) (quoting 42 U.S.C. §
423(d)(2)(A)).  The Social Security Act provides a five step
evaluation process for the ALJ to determine whether the
claimant's condition meets that of a disability.  20 C.F.R. §§
404.1520 & 416.920.

Under the first step, a claimant is not disabled if he or
she is currently employed.  Goodermote v. Secretary of Health and
Human Services, 690 F.2d 5, 6 (1ˢᵗ Cir. 1982).  If not currently
employed, the decision maker proceeds to the second step.  The
second step evaluates whether the claimant has a severe
impairment.  Id.  A severe impairment meets the durational
requirement and "significantly limits your physical ability to do
basic work activities."  20 C.F.R. §§ 404.1509  1520(c).  If the
claimant does not have a severe impairment, she is not disabled.
Goodermote, 690 F.2d at 6.

If the claimant is severely impaired, the third step
applies.  At the third step, the ALJ determines whether the
impairment is equivalent to one listed in Appendix 1, Subpart P,
Part 404 of the Code of Federal Regulations.  20 C.F.R. § 416.
If the claimant has a listed impairment or "an impairment of so
serious a degree of severity," the claimant is disabled.
Goodermote, 690 F.2d at 6.  If the claimant is not determined to

have a listed impairment, or an impairment of such severity, the
ALJ decides whether the claimant has the residual functional
capacity ("RFC") to perform her past relevant work.  20 C.F.R. §
404.1520(e).  Past relevant work is defined as work that the
claimant has done in the last 15 years.  20 C.F.R. §
404.1560(b)(1).  The claimant is not disabled if she can do such
past relevant work.  Goodermote, 690 F.2d at 7.

At the fifth step, the ALJ evaluates whether the claimant's
RFC, age, education and work experience suggest that he or she
could perform another job in the national economy.  20 C.F.R. §
404.1520(a)(4)(v).  "Plaintiff bears the burden in the first four
steps of showing that she is disabled."  Rohrberg v. Apfel, 26
F.Supp.2d 303, 306 (D.Mass. 1998).  "Once the claimant has
established that she is unable to return to her former
employment, however, the burden shifts to the Commissioner to
prove the fifth step."  Id. at 306-307.

Applying the foregoing sequential analysis, plaintiff has
not engaged in any substantial gainful activity during the
relevant period.  (Tr. 22).  The ALJ proceeded to the second step
and found that plaintiff had severe impairments including
restrictive lung disease with asthma, status post diaphragmatic
hernia repair, fibromyalgia, obesity and depression.  (Tr. 22).

17

Applying the third step, the ALJ found that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. art 404, Subpart P, Appendix 1." (Tr. 23).

The ALJ continued to the fourth step and found that plaintiff has the RFC to perform light work:

> [E]xcept for an inability to lift and carry over 20 pounds occasionally and 10 pounds frequently; an inability to stand and walk over 2 hours in an 8 hour work day; a need to limit climbing, balancing, stooping, and crawling to occasional in frequency; a need to avoid exposure to significant fumes or extremes of heat; a need for simple routine and repetitive tasks in a stable work environment and which requires only simple decision-making, and which was object/material based.

(Tr. 24). Finally, although plaintiff had no past relevant work, the ALJ considered her age, education, work experience and RFC and determined that jobs exist in significant numbers in the regional and national economy that plaintiff could perform. (Tr. 31).

Plaintiff argues that the ALJ erred in evaluating her fibromyalgia and that his findings were not supported by substantial evidence. (Docket Entry # 12). Specifically, plaintiff maintains that the ALJ improperly limited the probative value of plaintiff's treating physician, Dr. Davidson, and relied too heavily on the lack of objective findings. (Tr. 29). Dr.

Davidson's examination on May 16, 2005, limited plaintiff to three hours sitting, one hour standing and one hour walking in an eight hour work day and further limited her to lifting only five pounds on a regular basis. (Tr. 420).

While the ALJ typically affords more weight to a treating physician, he is not required where the treating physician's findings are inconsistent with evidence in the record. <u>See Arroyo v. Secretary of Health and Human Services</u>, 932 F.2d 82, 89 (1st Cir. 1991). In considering the entire record, the ALJ cited for support treatment notes of Nurse Leal from GNBCHC, who saw plaintiff on numerous occasions, Dr. Chan's rheumatology examination, Dr. Gonzalez's treatment notes from psychology sessions, state agency physicians' assessments and testimony of expert Dr. Ruggiano. (Tr. 30). Although the ALJ discredited Dr. Davidson's report for inconsistency, he did cite support from other examinations in the record. (Tr. 30). Inconsistencies in the record are for the Commissioner to resolve, not the court. <u>Costa v. Astrue</u>, 565 F.Supp. 2d 265, 271 (D.Mass. 2008). The ALJ supported his findings with reports from three state agency physicians who concluded plaintiff was capable of a range of light work (Tr. 30) which was consistent with Nurse Leal's opinion that plaintiff should avoid heavy work but remain active.

(Tr. 295).  More weight is to be given to opinions that are consistent with the record.  20 C.F.R. 416.927(d)(4).

The ALJ also cited Dr. Chan's notes from May 3, 2005, which assessed "diffused pain syndrome" and opined that he suspected it would be fibromyalgia.  (Tr. 296-297).  In a follow-up with Dr. Chan, however, Dr. Chan attributed the symptoms to deconditioning and morbid obesity, concluding the symptoms were likely "psychosomatic."  (Tr. 383).

The ALJ found plaintiff's testimony inconsistent with RFC assessments and medical examination notes in the record and therefore found her testimony lacked credibility.  (Tr. 24). Plaintiff also argues that the ALJ erred in discrediting her subjective complaints of pain for lack of objective findings. (Docket Entry # 12).

Plaintiff testified at the hearing that she could not perform self care daily activities during the relevant period. (Tr. 490-493).  The ALJ referenced Dr. Gonzalez's notes, however, including plaintiff's statements on May 5, 2004, that she could perform self care activities such as cleaning the house, preparing meals, shopping, handling money and taking care of her seven children.  (Tr. 331-333).  The ALJ relied on the testimony of Dr. Ruggiano, a non examining physician, that plaintiff did

not reflect an inability to perform full time work on a sustained basis. (Tr. 504, 512). A non-examining physician may constitute substantial evidence. See Tremblay v. Secretary of Health and Human Services, 676 F.2d 11, 13 (1st Cir. 1982); Berrios-Lopez v. Secretary of Health and Human Services, 951 F.2d 427, 431 (1st Cir. 1991); Brown v. Apfel, 71 F.Supp.2d 28, 39 (D.R.I. 1999).

In addition, Dr. Freeman testified at the first hearing that fibromyalgia symptoms, such as pain in specific tender points, would be constant. (Tr. 464). Plaintiff's reports and complaints of pain to her medical examiners during the relevant period, however, varied. (Tr. 154, 213, 229, 252, 305, 306 & 382). Furthermore, plaintiff routinely did not exhibit acute distress. (Tr. 155, 240, 249, 252, 270, 278 & 285). Although complaints of pain do not have to be corroborated by objective findings, complaints must be consistent with medical findings. See Dupois v. Secretary of Health and Human Services, 869 F.2d 622, 623 (1st Cir. 1989).

The ALJ is to consider the statements of those who treated the claimant when evaluating the intensity and persistence of the claimant's symptoms. 20 C.F.R. §§ 416.929(a) & (c). Plaintiff rated her pain only a six on a ten point scale to Dr. Davidson on September 20, 2004, and again on December 13, 2004. (Tr. 300,

306).  The primary symptoms of fibromyalgia are pain all over and the only objective signs of the condition are specific trigger points for tenderness.  See Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009).  Dr. Chan only found tender points on one occasion (Tr. 296) but ultimately concluded that plaintiff's symptoms were psychosomatic.  (Tr. 383).  In short, substantial evidence supports the ALJ's decision to discredit plaintiff's subjective complaints of pain.

Finally, the ALJ posed a hypothetical at the hearing to the testifying vocational expert that included the characteristics of plaintiff and the limitations recorded in the RFC assessment. (Tr. 512).  The vocational expert testified that an individual with similar limitations to those of plaintiff would reasonably be capable of performing jobs at the sedentary and light levels that exist in significant numbers in the national economy.  (Tr. 512-513).

In sum, this court must affirm the ALJ's findings if they are supported by substantial evidence.  See Richardson v. Perales, 402 U.S. 389, 390 (1971).  The ALJ properly considered the entire record and his decision was supported by substantial evidence.  (Tr. 20-32).

CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[5] plaintiff's motion to reverse or remand the decision

of the Commissioner (Docket Entry # 11) be **DENIED** and the

Commissioner's motion to affirm the decision (Docket Entry # 13)

be **ALLOWED.**


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

[5] Any objections to this Report and Recommendation must be filed
with the Clerk of Court within 14 days of receipt of the Report
and Recommendation to which objection is made and the basis for
such objection.  Any party may respond to another party's
objections within 14 days after service of the objections.
Failure to file objections within the specified time waives the
right to appeal the order.